**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | :: | |
| | :: | |
| **v.** | :: | **CRIMINAL ACTION NO.** |
| | :: | **1:12-CR-180-01-JOF/AJB** |
| **TERRY LEWIS BURSTON,** | :: | |
| | :: | |
| **Defendant.** | :: | |

**UNITED STATES MAGISTRATE JUDGE'S
FINAL REPORT AND RECOMMENDATION**

Pending before the Court are Defendant Terry Lewis Burston's motions to suppress evidence and statements, [Doc. 27], and for severance, [Doc. 28]. The Court held evidentiary hearings on the motion to suppress, [Doc. 38 (hereinafter "T__"), Doc. 44 (hereinafter "2T__")], after which the parties filed briefs, [Doc. 45 (government), Doc. 47 (Burston)]. The government did not file a reply. [*See* Dkt.]. For the following reasons, the undersigned **RECOMMENDS** that Burston's motion to suppress, [Doc. 27], be **DENIED**, and that his motion for severance, [Doc. 28], be **DENIED AS MOOT**.

## I.    *Introduction*

On June 5, 2012, a Grand Jury in this District charged Burston and Reginald Lamon Strozier with committing an armed bank robbery on May 16, 2012, at a

SunTrust Bank branch in Atlanta. [Doc. 15]. On October 9, 2012, Strozier entered a guilty plea to the charge, [Doc. 41], and is awaiting sentencing by the District Judge.

## II.  Motion to Suppress, [Doc. 27]

### A.  Facts

The Court finds the following facts from the evidentiary hearings and the docket. On May 16, 2012, at approximately 9:30 a.m., the SunTrust Bank branch on Chattahoochee Avenue in Atlanta was robbed of approximately $18,508. Criminal Complaint, ¶ 3 [Doc. 1 at 2]; *see also* T56. Atlanta Police Department ("APD") Officer Lawrence, who had been on the force since 2001, responded to the scene within three minutes of the dispatch. T4-5. The dispatch advised that the bank had been robbed by two masked armed individuals who were last seen leaving the bank and running across Chattahoochee Avenue into the woods. T5. Lawrence received no other details about the suspects, such as gender, race, age, or clothing. T17-18. Lawrence decided to drive one block past the bank and see if he could locate the subjects. T5-6. He pulled into the parking lot of a business on the opposite side of the street from the bank, and almost immediately (within two minutes) observed two males exiting the wood-line area consistent with the direction the suspects were observed fleeing from the bank. T6, 22. As they were exiting the woods, the individuals were preoccupied with placing items

2

into the bags they were carrying, actions that appeared suspicious to Lawrence. T6-7, 23. The men were not masked or wearing hoods, but they were casually dressed. T18-19. Although Lawrence intended only to watch them, the individuals noticed his marked vehicle, appeared to be "spooked," and ran in opposite directions, one across the street (darting out into traffic) and the other back into the woods. T7-8.

Lawrence was closer to the suspect who ran across the street, so he decided to chase him. T8. He first drove across the street and parked in another lot without losing sight of the suspect. T8-9. As he got out of his vehicle, Lawrence was yelling, "police, police, stop," but the suspect ignored him. T11. The suspect ran alongside a building towards the rear and entered an open door near the rear of a furniture warehouse. T10. Lawrence followed and saw the suspect run across the building to another doorway, and before exiting, place the gray gym bag he was carrying in the corner near some trash cans and work debris. T10-11, 26-27. The workers in the building appeared shocked, and they also told Lawrence that the suspect dropped the bag. T11. Lawrence told dispatch to have someone retrieve the bag, and he continued his chase of the suspect. T11, 28.

The suspect ran outside the first building and into another building, and Lawrence lost sight of him for about two minutes. T12, 25. Another APD officer,

3

Officer Codner, arrived on the scene. T12. Although Lawrence and Codner could not find the suspect in the second building, they heard workers outside stating that he ran out of the building. T13. The officers left the building and saw workers pointing towards the woods. T13. Codner, who was ahead of Lawrence, was able to apprehend the suspect with the assistance of some of the employees from the furniture warehouse. T14, 18. Lawrence identified the man in custody as the same person he had been chasing, the defendant, Terry Lewis Burston. T15.

In the meantime, APD Officer Coleman arrived on the scene in response to the report of a bank robbery. T33. As he approached the warehouse where Lawrence's patrol car was parked, he was told by warehouse employees that the police officers ran to the wooded area in the rear. T33. When he came back around the warehouse in an effort to locate the other officers and the fleeing suspect, the workers stopped him again and handed him a gray mesh bag, stating that the man the police were chasing dropped this bag in the in the corner by the door as he was running out of the warehouse. T33, 35, 36.[1] The bag was unzipped. T41. Coleman squeezed the bag for weapons, and feeling none, secured it in his vehicle. T33-34. Because it was mesh, he could see

_____

[1]        Coleman later returned to the warehouse where one of the employees showed him where the suspect had dropped the bag. T38.

AO 72A
(Rev.8/8
2)

clothing inside the bag. T35. At the bank, he turned the bag over to APD Investigator Foster. T35.

The bag's contents were inspected at the bank. T36, 41. The bag was emptied of its contents and photographed. T41; 2T5-7, 10.[2] It contained clothing, fruit, and a several thousand dollars of U.S. currency in $20 bills with a cash wrapper. T41.

Meanwhile, after his arrest, Burston was placed in the rear of Codner's patrol car. T29. Lawrence asked him why he ran, and Burston stated he was in the area to buy drugs. T30-31.[3] FBI Special Agents Early and Richards arrived and saw that both suspects were in custody. T46.[4] Early saw Burston handcuffed with his hands behind him, sitting in the back of an APD patrol car. T46. Early had Burston removed from the car, moved his handcuffs to the front, and sat him on the back seat of the car with the door open. T46. Richards read Burston his *Miranda* rights from Form FD-395

_____

[2] The bag and its contents initially were photographed beginning at 10:38 a.m. Gov't Ex. 4, Def't Ex. 2. They were later re-photographed at about 12:53 p.m. *See* Def't Ex. 3.

[3] The government states it is not intending to introduce this statement at Burston's trial. T80; Doc. 45 at 4 n.1.

[4] The FBI agents, who arrived on the scene shortly before 11:00 am, initially went to the bank but were immediately redirected to the scene where the two suspects were in custody in separate patrol cars. T55, 72-73.

AO 72A
(Rev.8/8
2)

(Gov't Ex. 2), as follows:

> Before we ask you any questions you must understand your rights. You
> have the right to remain silent. Anything you say can be used against you
> in court. You have the right to talk to a lawyer for advice before we ask
> you any questions. You have the right to have a lawyer with you during
> questioning. If you cannot afford a lawyer one will be appointed for you
> before any questioning if you wish. If you decide to answer any questions
> now without a lawyer present you have the right to stop answering at any
> time.

T47-48. Richards also read to Burston the following language from the form:

> I have read this statement of my rights and understand what my rights are.
> At this time I'm willing to answer questions without a lawyer present.

T48. Burston appeared to Early to understand his rights. T48. Burston acknowledged

that he understood his rights. Gov't Ex. 3 at 1. He stated he wished to speak. T50. He

also signed the waiver form, and his signature was witnessed at 11:30 a.m. Gov't Ex.

2; T50-51.

Neither FBI agent nor the APD were observed threatening or promising any

benefit to Burston to waive his rights. T48-49. The agents were armed, but their

weapons were concealed. T49-50. Burston did not appear to be impaired. T64. He

was very responsive and cordial. T64. Burston told the agents

> that he had ridden the bus to that area and the reason he had come to the
> area was to purchase a suit at one of the suit -- there's suit outlets there in
> the area. So he wanted to come there and buy a suit. He had ridden the

6

bus. He had gotten off the bus. He was walking. He saw the police. He explained to us that he was either in custody or recently out of custody so he felt uncomfortable around the police so that was why he ran.

T50; *see also* T58 (Burston also explained that after getting off of the bus, he was approached by a man wanting to sell him drugs, and when he saw the police, he took off.). He also stated that he did not know anything about the robbery. T50. An APD officer brought the bag to the scene and handed it to Richards. T52. Upon being shown the gray mesh bag (which was full but now zipped, T59-60), Burston acknowledged it was his and that his nickname, "T-Bone" was written on the bag. T52.

While still in custody, Burston was driven to the bank. T29, 68. He was then transported to APD headquarters for processing by FBI Special Agents Campbell and Richards. T69, 75. Early and Richards told Campbell that Burston had been given *Miranda* warnings. T77. While driving to APD headquarters, Campbell asked Burston where the masks and gun were located. T70. Burston replied that he did not know anything about it. T70. Burston then asked why was he being asked that question, and Campbell told Burston he was being charged with armed bank robbery and possession of a firearm during a felony, and that he (Campbell) wanted to find the gun. T70, 76. Burston responded that it was not a real gun. T70, 76. Although Strozier, the other subject who was being interviewed at the same time Early and Richards were

7

interviewing Burston, had stated to Campbell that he lost some items in the woods, Burston provided no additional information.  T71, 73.[5]

### B.    *Contentions of the Parties*

Burston moves the Court to issue an Order suppressing evidence obtained from him and statements made by him after his arrest.  [Doc. 27].  Specifically, Burston asks the Court to suppress all items found in his bag and to suppress the portion of his post-arrest statements in which he admitted ownership of the bag and stated that the gun was not real,  [*id*. at 3], and that he was in the area to buy drugs, [Doc. 47 at 18].

Because the arrest and search were conducted without a warrant and because Burston seeks to suppress statements made prior to the administration of *Miranda* warnings, the government has the burden of proof.  The government first argues that Burston's arrest was supported by probable cause.  It argues that these facts support that conclusion: the bank robbers were seen running into the woods, and just a few minutes later, Lawrence observed Burston and Strozier come out of the woods in the same direction the robbers would have fled, in close proximity to the bank.  They were

_____

[5]    Strozier initially stated that Burston was not involved in the bank robbery and that he was assisted by a friend named "Jaybo."  T73-74.  At some point (exactly when is not clear in the record), he acknowledged that Burston was the other robber.  [Doc. 1 at 4 ¶ 10].

AO 72A
(Rev.8/8
2)

"preoccupied" with stuffing items into their respective bags. When they saw Lawrence, the men ran in opposite directions. Burston darted into traffic in an effort to evade Lawrence. Burston ignored Lawrence's directions to stop. He ran into two buildings as to which he had no apparent association. Burston dropped the bag he was carrying in an attempt to conceal it. Finally, the only reason Burston stopped was because he was caught. [Doc. 45 at 7-8]. The government concludes based on these facts—Burston's temporal and physical proximity to the scene of the crime, his unprovoked flight, and his demeanor and other actions upon exiting the woods—probable cause to arrest existed. [*Id.* at 10-12]. The government also argues that even if probable cause to arrest for the bank robbery did not exist at that time, Lawrence had probable cause to arrest Burston for jaywalking in violation of O.C.G.A. § 40-6-92. [Doc. 45 at 14].

The government also argues that even if Burston was arrested without probable cause, his statement to Campbell was sufficiently purged of any taint of an unlawful arrest due to the passage of time, the intervening *Miranda* waiver, and Burston's voluntary statements to Richards and Early, and the clear existence of probable cause once the stack of $20 bills in the wrapper was located in the gray mesh bag. [*Id.* at 14-18].

9

AO 72A
(Rev.8/8
2)

The government next argues that the gym bag was properly searched because Burston abandoned it by dropping it in the warehouse as he was fleeing from Lawrence. [*Id.* at 18-22].

Finally, the government argues that all of Burston's statements that it seeks to introduce at trial were voluntarily obtained. [*Id.* at 22-24].

In response, Burston argues that he was arrested without probable cause. He argues that his mere presence in the neighborhood in the company of another man, given the presence of a homeless tent shelter in the woods, T70, is insufficient to establish probable cause. He also argues that his flight added little to the mix, since as Lawrence testified, his flight might have meant he was scared, or did not have any identification, and that "because I was responding to a bank robbery, my experience, in my head I said this was probably the guy, one of the guys." [Doc. 47 at 13 (quoting T29)]. As a result, he argues that he was arrested not on probable cause, but rather on mere suspicion. [*Id.* at 14]. He also argues that probable cause did not exist for arresting him for jaywalking because there is no evidence that he did not yield to traffic. [*Id.*].

Burston next argues that he did not abandon the gray mesh bag, and thus it could not be searched without a warrant. In this regard, he contends that when he discarded

10

the bag, he attempted to conceal it and therefore intended to maintain dominion, control, and possession of it. [*Id.* at 16-17]. He also contends that Lawrence's testimony that after Burston left the first warehouse, he apparently tried to "double-back" during the chase, shows that he possibly was trying to retrieve the bag. [*Id.* at 17 (quoting T25-26)]. He also contends his intent not to abandon the bag is reinforced by his statements acknowledging that the bag was his. [*Id.* at 17-18]. Thus, he submits that the government did not satisfy its burden to establish abandonment. [*Id.* at 18].

As to his statements, the only statement to which Burston proffers any argument is the un-*Mirandized* statement to Lawrence and Codner that the government states it will not introduce at trial. [*Id.* at 18-19].

### C. Discussion

#### 1. Probable cause

The government bears the burden of demonstrating the legality of a warrantless arrest. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Tobin*, 923 F.2d 1506, 1521 & n.21 (11th Cir. 1991) (en banc). A warrantless arrest is constitutionally valid only when there is probable cause to arrest. *See United States v. Watson,* 423 U.S. 411, 417 (1976); *United States v. Costa,* 691 F.2d 1358, 1361

11

(11th Cir. 1982). Probable cause exists if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002); *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."); *United States v. Thevis*, 469 F. Supp. 490, 503 (D. Conn. 1979) ("Probable cause must exist at the time of arrest; the officers may not use facts which were learned only after the arrest to establish probable cause.") (citing *United States v. Sanudo-Perez*, 564 F.2d 1288, 1291 (9th Cir. 1977)).

"Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). In determining whether probable cause exists, the Court " 'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Gates v. Illinois*, 462 U.S. 213, 229-31 (1983) (quoting *Brinegar*

*v. United States*, 338 U.S. 160, 175 (1949)). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal punctuation marks and citations omitted). In this regard, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to [arrest] that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *Holmes v. Kucynda*, 321 F.3d 1069, 1081 (11th Cir. 2003).

At the same time, an officer is not required to resolve all inferences and all factual conflicts in favor of the suspect. An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for his decision to arrest a suspect. *Bailey v. Bd. of Cnty. Com'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992); *United States v. Pantoja-Soto*, 739 F.2d 1520, 1523-24 (11th Cir. 1984). Moreover, when a group of officers is conducting an operation and there exists at least minimal communication among them, their collective knowledge is determinative of probable cause. *United States v. Goddard*, 312 F.3d 1360, 1362 (11th Cir. 2002); *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir.

13

1992); *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir. 1984).

The Court's focus must be not upon each fact in isolation but " 'the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers.' " *Wilson*, 894 F.2d at 1254 (quoting *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977),[6] and *Smith v. United States*, 358 F.2d 833, 837 (D.C. Cir. 1966)). To determine whether an officer had probable cause to arrest an individual, the Court examines the events leading up to the arrest and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. *Pringle*, 540 U.S. at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The observations and experiences of the law enforcement officers working a case must be weighed as a part of the totality of the circumstances that might create probable cause for an arrest. *Gonzalez*, 969 F.2d at 1003. Probable cause " 'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.' " *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (quoting *Wilson v. Attaway*, 757 F.2d 1227, 1236 (11th Cir. 1985)).

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

14

AO 72A
(Rev.8/8
2)

Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been. *See, e.g., Whren v. United States,* 517 U.S. 806, 813-14 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas*, 517 U.S. at 696 (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy*, 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"); *see also Horton v. California*, 496 U.S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

Flight of a suspect, standing alone, does not establish probable cause. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). However, "in appropriate circumstances it can supply the 'key ingredient justifying the decision of a law enforcement officer to take action' . . . . 'Flight invites pursuit and colors conduct' that might otherwise appear innocent." *United States v. Herzbrun*, 723 F.2d 773, 778 (11th Cir. 1984) (citations omitted); *see also United States v. Smith*, 481 Fed. Appx. 540, 544

15

(11th Cir. July 12, 2012) (noting that a defendant's "efforts to flee, coupled with [a law enforcement officer's] reasonable suspicion that [the defendant] was involved in criminal activities, established probable cause to arrest [the defendant]") (quoting *United States v. Dotson*, 49 F.3d 227, 231 (6th Cir. 1995) (collecting authorities)).

In this case, probable cause supported Burston's arrest. The police knew that the Suntrust Bank had been robbed by armed individuals wearing masks who escaped into the neighboring woods. No more than five minutes later, Lawrence saw Burston (and Strozier) exit from the woods in the same direction that eyewitnesses reported that the robbers fled. He observed both of them being preoccupied with stuffing items into their bags, thus giving rise to a reasonable inference of joint conduct. Even if Lawrence was aware of a homeless camp in the woods, he described Strozier and Burston as dressed in casual clothes, not clothes perhaps more associated with homeless persons living in the woods. When these two subjects saw Lawrence, without provocation they fled in opposite directions. Burston darted into traffic across a busy street to avoid apprehension. He also failed to obey Lawrence's order to stop, and while fleeing, discarded the gray mesh bag in an effort to conceal it.[7]

_____

[7]    As a result of the Court's conclusion that probable cause existed to arrest Burston for the bank robbery, the Court need not discuss the government's alternate theory that Lawrence had probable cause to arrest Burston for jaywalking. The Court

AO 72A
(Rev.8/8
2)

The Court notes that Burston and Strozier's exit from the woods in temporal and physical proximity to the reported armed bank robbery, together with their preoccupation with stuffing items into their respective bags, gave rise to reasonable suspicion that they were involved in criminal activity, which authorized a *Terry* stop.[8]

---

notes that the government did not argue what the Court finds to be a more plausible ground for probable cause to arrest: obstruction of a law enforcement officer in violation of O.C.G.A. § 16-10-24(a). *See United States v. Foskey*, 455 Fed. Appx. 884, 888 (11ᵗʰ Cir. Jan. 9, 2012) (holding that where officer possessed reasonable suspicion that defendant had violated law, he had legal authority to conduct *Terry* stop; since officer's order to stop was lawful, when defendant ignored lawful order to stop and continued flight, probable cause existed that defendant had violated § 16-10-24(a) by obstructing and hindering officer's lawful duties). At a minimum, Lawrence had reasonable suspicion to detain Burston upon his exiting the woods with Strozier in physical and temporal proximity to the recently robbed bank, they both were preoccupied with stuffing items into their bags, they ran away in opposite directions, and Burston failed to comply with Lawrence's lawful order to stop. Thus, when Burston ignored Lawrence's lawful order to stop, there was probable cause to arrest him for obstruction of a law enforcement officer under Georgia law.

[8] Police officers may make an investigative stop if the circumstances are sufficient to enable them reasonably to suspect that an individual is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient. *United States v. Powell*, 222 F.3d 913, 917-18 (11ᵗʰ Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-75 (11ᵗʰ Cir. 1996). To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.' " *Wardlow*, 528 U.S. at 123-24 (quoting *Terry*, 392 U.S. at 27). Although reasonable suspicion "requires more than a hunch," *id.*, "the requisite level of suspicion to make an investigative stop is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' " *United States v. Smith*, 201 F.3d 1317, 1323 (11ᵗʰ Cir. 2000) (quoting *United States v. Glover*, 957 F.2d 1004,

17

AO 72A
(Rev.8/8
2)

When Burston thereafter fled and did not stop upon Lawrence's lawful command, *see Foskey*, 455 Fed. Appx. at 888, Lawrence had probable cause to arrest him at least for obstruction, if not for the bank robbery.  In any event, since, as discussed below, law enforcement lawfully could search the gray mesh bag without a search warrant because Burston abandoned it, the already lawful arrest for obstruction was transformed into a lawful arrest for the bank robbery upon discovery of the bank robbery proceeds in the gray mesh bag.

### 2.    *Warrantless search of the gray mesh bag*

The Fourth Amendment to the United States Constitution guards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and imposes a warrant requirement on most searches and seizures.   U.S. Const. Amend. IV; *United States v. Laist*, ---- F.3d ----, ----,

_____

1009 (2d Cir. 1992), and *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)).  In deciding whether reasonable suspicion exists, the Court must look at the totality of the circumstances known to the officers at the time of the attempted detention.  *Id.*; *Mikell*, 102 F.3d at 475; *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989).  The existence of reasonable suspicion is viewed from an objective standard.  *Terry*, 392 U.S. at 21-22.  And, the Eleventh Circuit views the totality of the circumstances in the light of the officers' special training and experience.  *Smith*, 201 F.3d at 1323 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-86 (1975)); *see also United States v. Cortez*, 449 U.S. 411, 417-19 (1981); *United States v. Bowles*, 625 F.2d 526, 533-34 (5th Cir. 1980).

AO 72A
(Rev.8/8
2)

2012 WL 6156278, at *4 (11th Cir. Dec. 11, 2012). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citing *United States v. Impson*, 482 F.2d 197 (5th Cir. 1973)); *see also United States v. Knight*, 336 Fed. Appx. 900, 904 (11th Cir. July 8, 2009). Thus, the government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment. *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.

Generally, an individual enjoys a reasonable expectation of privacy in personal property such as luggage. *See United States v. Cofield*, 272 F.3d 1303, 1306 (11th Cir. 2001); *United States v. McKennon*, 814 F.2d 1539, 1544 (11th Cir. 1987) (citing *United States v. Place*, 462 U.S. 696, 707 (1983)). However, abandoned property is not subject to Fourth Amendment protection. *Abel v. United States*, 362 U.S. 217, 241 (1960); *see also Cofield*, 272 F.3d at 1306 ("An individual who abandons or denies ownership of personal property may not contest the constitutionality of its subsequent acquisition by the police.") (citing *United States v. Ramos*, 12 F.3d

19

1019, 1023 (11th Cir. 1994); *United States v. Hawkins*, 681 F.2d 1343, 1345 (11th Cir. 1982)). In determining whether there has been abandonment, the " 'critical inquiry is whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.' " *Ramos*, 12 F.3d at 1022 (quoting *United States v. Winchester*, 916 F.2d 601, 603 (11th Cir. 1990)). Whether abandonment has occurred is a question of intent that may be inferred from acts, words and "other objective facts." *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982). Events that occurred after the abandonment can be considered as evidence of a defendant's intent to abandon the property. *Winchester*, 916 F.2d at 604. Also, " '[p]olice pursuit or the existence of a police investigation does not of itself render abandonment involuntary.' " *United States v. Jefferson*, 451 Fed. Appx. 833, 834 (11th Cir. Dec. 29, 2011) (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973)). While the individual whose property was searched bears the burden of proving a legitimate expectation of privacy in the items searched, the burden of proving abandonment is on the government. *See Ramos*, 12 F.3d at 1023.

Here, the Court concludes that the government established that Burston abandoned the gray mesh bag. While he was running from Lawrence, Burston

AO 72A
(Rev.8/8
2)

voluntarily discarded the bag. *California v. Hodari D.*, 499 U.S. 621, 629 (1991) (holding that an individual is not seized while fleeing police, so items discarded or abandoned during the chase are not evidence susceptible to exclusion); *United States v. Edwards*, 644 F.2d 1, 2 (5th Cir. Unit B May 1981) (per curiam) (stating that if defendant has abandoned property—meaning that he has "voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question"—he has no reasonable expectation of privacy in the property, and thus no right to object to a search thereof) (citation omitted).

Burston points to three facts in support of his argument that he did not abandon the bag. The Court addresses each in turn.

First, Burston claims that his attempt to hide the bag in the corner of the warehouse demonstrates an intent not to abandon it. The point is that he physically relinquished control of the property. Although Burston perhaps attempted to conceal the bag, he left it in an area in which he had no legitimate access but which was generally accessible to other members of the public, i.e., the warehouse workers, who in fact delivered the bag to the police. *See United States v. Thomas*, 864 F.2d 843, 846 (D.C. Cir. 1989) (determining that an individual intended to abandon his bag when he set it in a common hallway, even if he intended to return for it, because his ability to

21

do so would depend on whether other persons disturbed his property). Since the place he tried to secret the bag was not a place to which he enjoyed a legitimate expectation of privacy, his action is not inconsistent with abandonment. *See United States v. Burbage*, 365 F.3d 1174, 1178 (10th Cir. 2004) ("Regardless of an individual's subjective intent or understanding, the individual is treated as having abandoned an object if it would be unreasonable in the circumstances for the person to have an expectation of privacy with respect to that object."); *see also United States v. Morgan*, 936 F.2d 1561, 1565, 1570 (10th Cir. 1991) (where defendant fled from police to house of acquaintance but was unable to gain entry, threw bag he was carrying to side of porch and headed back down the porch stairs in the direction of police, court concluded he abandoned bag because "[t]he fact that [defendant] was in the backyard of someone he knew or was acquainted with, at the time he threw the bag, is of little significance. The record reveals we do not have before us a case where the item was left to the care or responsibility of another, or where there is a delayed indication of an intent to retain an expectation of privacy in the item."); *United States v. Dillard*, 78 Fed. Appx. 505, 511 (6th Cir. Oct. 20, 2003) ("Dillard, like Morgan . . . , was not attempting to secrete the container in a place where he had an expectation of privacy, but rather discarded the item in his attempt to avoid arrest.").

AO 72A
(Rev.8/8
2)

Second, Burston argues that he was "doubling back" for the bag. This argument suffers from similar defective reasoning. *See United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000) (recognizing that abandonment involves "an objective test," and thus "it does not matter whether the defendant harbors a desire to later reclaim an item"; the court must look "solely to the external manifestations of [defendant's] intent as judged by a reasonable person possessing the same knowledge available to the government agents"); *see also United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995) (holding that although defendant "clearly intended to return and retrieve the bag," in order for the bag not to be considered abandoned, he had to "show more than his subjective intent"—he had to demonstrate that his expectation of privacy was "one that society would recognize as objectively reasonable") (internal quotation marks and ellipsis omitted); *United States v. Rem*, 984 F.2d 806, 810-11 (7th Cir. 1993) (where defendant jumped off train before reaching his destination and left his suitcases on the train in area open to public, abandonment found notwithstanding defendant's subjective intent to regain possession of suitcase later).

Finally, Burston argues that his admission to the police that the bag was his demonstrates his intention not to abandon it. This argument also fails. First, it is clear

AO 72A
(Rev.8/8
2)

that the bag by that point in time already had been searched, because it was photographed at 10:38 a.m. and Burston's admissions about owning the bag were not made until he was questioned by the FBI after 11:30 a.m., following his waiver of *Miranda* rights. Second, the government's showing on abandonment is not undermined by Burston's admission that the bag was his, because his subjective intentions are not relevant. *See United States v. Liu*, 180 F.3d 957, 960 (8th Cir. 1999) ("It is without dispute that Liu never verbally denied ownership of his bag; indeed, he affirmed his ownership more than once. But he nevertheless may have abandoned the bag by physical relinquishment, even while claiming ownership, since a verbal disclaimer of ownership is not required for a finding of abandonment.") (citations omitted).

As a result, Burston is not entitled to the suppression of the contents of the gray mesh bag.

### 3. *Voluntariness of statements*

As previously noted, in his post-evidentiary-hearing brief, the only statement Burston appears to contest is his un-*Mirandized* statement to Lawrence and Codner in response to the question about why he ran. [Doc. 47 at 18-20]. The government has stated that it will not attempt to introduce this statement. [Doc. 45 at 4 n.1]. As a result, the motion to suppress as to that statement is **DENIED AS MOOT**.

24

As to the other statements—generally, that the gray mesh bag was his and the gun was not real—Burston makes no argument. Thus he has abandoned his challenges to those statements. *See Smith v. Sec'y, Dep't of Corrs.*, 572 F.3d 1327, 1342 n.8 (11th Cir. 2009) ("Failure to offer any argument on an issue in a brief abandons that issue.").

Even if he had not abandoned any issue as to these statements, the Court would conclude that the statements were voluntary. The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475. Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983). The government must prove by a preponderance of the evidence that the defendant waived his rights knowingly and voluntarily. *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005). An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or

25

deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). A waiver is effective where the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension. *United States v. Wright*, 300 Fed. Appx. 627, 632 (11th Cir. Nov. 12, 2008) (citing *Barbour*, 70 F.3d at 585).

Here, although it is undisputed that Burston was subject to custodial interrogation necessitating *Miranda* warnings, it is clear that the agents provided the requisite *Miranda* warnings and Burston knowingly and voluntarily waived these rights. First, there was no evidence that the waiver was the involuntary product of any coercion, deception, or intimidation by Richards or Early. Early testified that weapons were not displayed, the interaction with Burston was not confrontational, and there was no evidence of any threats or promises. Burston appeared eager to tell what happened and never requested an attorney. There is no evidence that Burston's decision to answer the agents' questions was not the product of a free and unconstrained choice.

Second, the evidence established that Burston's waiver was knowing and intelligent. He was read his rights and signed the written waiver. There is no indication he did not understand his rights or the consequences of his waiver of those rights.

26

Although the record is silent as to his educational level, Burston was employed and possessed a cell phone with his nickname on the home screen. *See* Gov't Ex. 3 at 3, 4. Thus, the record shows an acceptable level of intelligence to make a knowing and intelligent choice.

Turning to the voluntariness of the statements themselves, the focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement. *Connelly*, 479 U.S. at 170 ("The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.") (citation omitted). The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828

27

(11th Cir. 1996). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).

There is no evidence that Burston was coerced into making any statement. Although he was handcuffed at the scene of his arrest, his handcuffs were moved to the front, and he was allowed to sit with his legs outside of the police vehicle. He was not threatened or promised any benefit, nor were firearms displayed to him. The questioning was not lengthy. As a result, Burston's statements to Early and Richards were voluntary.

Similarly, Burston's statement to Chapman was voluntary. The questioning was brief. There is no evidence that Chapman coerced Burston into making the statement.

For all of these reasons, the undersigned **RECOMMENDS** that Burston's motion to suppress, [Doc. 27], be **DENIED**.

AO 72A
(Rev.8/8
2)

### III.    *Motion to sever, [Doc. 28]*

Burston's motion to sever is predicated upon co-defendant Strozier's post-arrest statements implicating Burston in the SunTrust Bank robbery. Thus, he argues, two problems are presented. First, under *Bruton v. United States*, 391 U.S. 123 (1968), he argues that Strozier's inculpatory statements about him could not be introduced at a joint trial because it would violate his confrontation rights. Second, he argues that Strozier made repeated denials of Burston's involvement in the bank robbery but at a joint trial, again Strozier could not be compelled to testify in Burston's favor.

As a result of Strozier's guilty plea, Strozier will not be tried with Burston. Therefore, the confrontation and compulsion problems anticipated by Burston arising from a joint trial have been eliminated. Therefore, the undersigned **RECOMMENDS** that Burston's motion to sever, [Doc. 28], be **DENIED AS MOOT**.

### IV.    *Conclusion*

For all of the above-stated reasons, the undersigned **RECOMMENDS** that Burston's motion to suppress, [Doc. 27], be **DENIED**, and that his motion to sever, [Doc. 28], be **DENIED AS MOOT**.

The undersigned now has ruled on all pretrial motions and is unaware of any impediments to the scheduling of a trial. Therefore, this matter is **CERTIFIED**

29

AO 72A
(Rev.8/8
2)

**READY FOR TRIAL**.

      **IT IS SO RECOMMENDED AND CERTIFIED**, this the   4th   day of January, 2013.

                                     _____
                                     **ALAN J. BAVERMAN**
                                     **UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)